UNITED STATES of America,
Plaintiff-Appellee,

v.

Joe Leal MORALES, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Rudolfo Rodriguez GONZALES,
Defendant-Appellant.

Nos. 72–2635, 72–2777.

United States Court of Appeals,
Fifth Circuit.

April 18, 1973.

John M. Killian, San Antonio, Tex. (Court-Appointed), J. Douglas McGuire, San Antonio, Tex. (Court-Appointed), for defendant-appellants.

William S. Sessions, U. S. Atty., James F. Bock, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

RIVES, Circuit Judge:

Joe Morales and Rudolfo Gonzales, along with Andres Vargas, were tried jointly and each was found guilty of conspiring to defraud an agency of the United States Government, the Bureau of Narcotics and Dangerous Drugs (hereafter BNDD),[1] by intentionally selling to a BNDD agent a nonnarcotic substance (wheat) which they represented to be heroin.

The fourth defendant, Juan Luis Davila, who planned the sale, pleaded guilty and testified as the principal government witness against each of his codefendants. Neither Gonzales nor Vargas testified on his own behalf. Morales did testify, admitting participation in the sale, but insisting that Davila deceived him into believing that the transaction was a normal sale of genuine heroin to a nonagent.

On appeal, Morales argues (1) that the trial court erred in allowing the jury to convict on the strength of the uncorroborated, "incredible" testimony of Davila and (2) that admission of the extra-judicial confessions of Gonzales and Vargas violated the rule of Bruton v. United States, 1968, 391 U.S. 123, 88 S. Ct. 1620, 20 L.Ed.2d 476, by inculpating Morales without affording him the constitutional right to confront his accusers. Gonzales attacks the propriety of his conviction on the two grounds asserted by Morales and contends, in addition, that he was entrapped. We reverse Morales' conviction, but affirm the conviction of Gonzales.

1. The indictment contained one count and charged six overt acts in furtherance of a conspiracy punishable under 18 U.S.C. § 371.

## THE CONSPIRACY

By his own admission, Davila set in motion the bizarre chain of events, which culminated in the fraudulent sale. (Rec Vol. II, p. 181.) He contacted BNDD Agent Nattinger for whom he had worked as an informer in the past, identified himself, and promised to arrange a heroin purchase between an undercover BNDD agent and a notorious local pusher named Esquivel (see Agent Nattinger's testimony at Rec. Vol. II, pp. 27–29). Davila had no direct contact with Esquivel; he lied to the government from the start.

According to the plan reached between Davila and the government, BNDD Agent Lozano would pose as an out-of-town buyer from Houston and rent a room at the Holiday Inn in San Antonio where the exchange with Esquivel would take place under heavy surveillance.

After the scheme was formulated, Davila enlisted the aid of appellants who agreed to help make the delivery. Gonzales accompanied Vargas who drove to the Holiday Inn parking lot on March 17, 1972. Gonzales handed the crucial package to Morales who was waiting in the parking lot. Morales then proceeded to the motel room and, posing as Esquivel, gave the package to Lozano in exchange for $3,000 (Rec. Vol. II, pp. 146–148). An analysis of the package contents immediately after the sale revealed that Agent Lozano had purchased wheat, not heroin. The four defendants were quickly apprehended and charged with defrauding the government.

## MORALES' CONVICTION

The only direct evidence linking either appellant with the "conspiracy" to defraud the government was the accomplice testimony of Davila. Both a dope addict and convicted felon (Rec. Vol. II, p. 202), Davila had worked as an informer for the BNDD in the past (Rec. Vol. II, p. 34). He testified that Morales and Gonzales discussed with him the possibility of "burning" Agent Lozano,[2] that Gonzales agreed to construct the fake heroin package,[3] and that both appellants knew Rudy Lozano's true identity.[4] According to Davila, the $3,000 purchase price paid to Morales by Agent Lozano was to be split three ways —one third for each appellant and one third for Davila.[5]

2. One of the discussions supposedly took place at the Comet Drive-In, as revealed by the following colloquy:
   "Q. What happened after you got there [Comet Drive-In]?
   "A. Joe [Morales] went and called Rudy [Gonzales] and Rudy crossed the street and started talking to Joe. Then I got into the conversation with them.
   "Q. What were they talking about?
   "A. About Rudy Lozano there.
   "Q. What were they saying?
   "A. Well, about, you know, about him having them about $3,000 and all, figuring out a way of how to burn him.
   "Q. What do you mean 'burn him'?
   "A. Trying to figure out how would be the best way to go about delivering something to where he would go for it without putting—having to put any heroin in front."
   Rec. Vol. II, pp. 189–190.

3. Davila stated, at p. 190 of the Record, Vol. II:
   "Well, that was going to be left up to Rudy Gonzales. He was going to fix that package up. We didn't know what was going to be in the package. We just knew it was going to be some kind of powder to where it looked like heroin."

4. When pressed on cross-examination about his earlier, equivocal assertion that Rudy Gonzales "knew more or less" that Lozano was an undercover agent, Davila replied: "Well, 'more or less' is the same thing, like knowing; to me, it is." (Rec. Vol. II, p. 212.)

5. After the sale, Morales was apprehended with $950 of the marked money on his person. This fact supports Davila's assertion that the profits were to be evenly divided and belies Morales' claim that he was participating in the transaction as a favor to Davila, expecting only a fix and a little money for his efforts. (Rec. Vol. II, pp. 255, 256.)
   However, Morales claimed that he was merely holding the money for Davila (Rec. Vol. II, p. 258), and in any event the ultimate disposition of the $3,000 does not directly bear on the critical issue—the extent of Morales' involvement in the plot to defraud.

In striking contrast to Davila's tale, Morales testified that he did not know that Lozano was an undercover agent or that the package was a sham (Rec. Vol. II, p. 267). He insisted that he would never have knowingly delivered the package to a government agent.[6]

(A) *Davila's Testimony*

In Tillery v. United States, 5 Cir. 1969, 411 F.2d 644, 647, this Court held that,

> "In determining whether there is substantial evidence in cases where a conviction rests upon the uncorroborated testimony of an accomplice, the general rule is that the uncorroborated testimony of an accomplice may support a conviction if it is not incredible or otherwise unsubstantial on its face [citing cases]."

Relying upon the rule in *Tillery,* coupled with the trial judge's characterization of Davila's testimony as "inconceivable," [7] Morales argues that the district court erred in allowing the jury to convict him on the strength of Davila's unsupported testimony.[8]

■ Although Davila's testimony was both improbable and crucial to Morales' conviction, the principles enunciated in *Tillery, supra,* do not dictate a reversal here. *Tillery* is distinguishable from the instant case in two important respects.

1) In *Tillery* the accomplice who uttered the damaging testimony had made earlier contradictory statements about the crime. Thus, the testimony of the *Tillery* accomplice was both incredible and demonstrably unreliable.[9] By con-

---

6. Morales parried repeated leading questions by government counsel designed to elicit an admission, arguing quite logically that, in his view, delivery of either heroin or nonheroin to a government agent while under surveillance would be suicide.

7. At one point during the trial, outside the presence of the jury, the trial judge openly expressed his disbelief in Davila's story:
   "I just can't see, to save my life, why any people who are just reasonably intelligent would conspire to take money from a federal agent, that it is just so impossible and improbable and inconceivable to me that I just can't—I just can't visualize it in my mind."
   Rec. Vol. II, p. 316.
   Later at the sentencing proceedings after trial, the trial judge reiterated his incredulity:
   "I want to clarify my position. I still think it is a truth—is—stranger-than-fiction type of story. I was not the fact-finder. I wasn't passing upon the credibility of either of the two witnesses [Davila or Morales]. I was just saying that probably what Mr. Morales said to the effect that there was no way in which he would have done what he was accused of having done, that this would comport more with my idea of what the situation might have been, but I didn't want to, impliedly or otherwise, indicate that I was taking away from the jury the fact finding job."
   Rec. Vol. II, p. 398.

8. Although the government contends that Davila's testimony was buttressed by the

extrajudicial confessions of Gonzales and Vargas, Gonzales' confession was improperly admitted (see discussion of *Bruton* rule, *infra*), and Vargas' "confession" was too ambiguous to represent any more than a weak implication that appellants knew of the plot to defraud. Hence, Davila's testimony stands alone as evidence of appellants' guilt.
   At page 11 of its brief, the government argues that "there was strong corroboration of the accomplice's testimony, provided by several narcotics agents who had witnessed the events outside the motel and had participated in the arrests." This statement misses the point. Appellants admit participation in the sale; they only deny knowledge of the fraud. The eyewitness testimony of the agents to which the government brief refers merely places the appellants at the scene of the crime; it does not establish their awareness of the plot to deceive—a necessary element of the crime for which they are charged.

9. Prior to his testimony at trial in *Tillery,* the accomplice, Padgett, had given four different, contradictory statements regarding the burglary. This prompted the court in *Tillery* to observe that, "Padgett's crucial testimony was extremely unreliable, if not incredible and unsubstantial, in view of his earlier contradictory statements in which he indicated less concern with the truth than with his own skin * * *." (411 F.2d at 648.)

trast, Davila's testimony, although dubious and at times ambiguous, was not rendered unreliable by any prior contradictory statements.

2) However, a more important distinction can be drawn. In *Tillery*, the trial court permitted the jury to decide the defendant's guilt on the basis of accomplice Padgett's unsupported story "without the benefit of an instruction that accomplice testimony should be received with caution and viewed with skepticism." (411 F.2d at 646.) Such an admonition was direly needed in *Tillery*, and the absence of a proper limiting charge was the key reason for reversal in that case.[10]

In the present case, the trial judge clearly instructed the jury "that the testimony of an accomplice should be close-ly examined, received with caution and weighed with great care." [11] His charge correctly placed Davila's testimony under the harsh light required by *Tillery*. If, after viewing his testimony with a skeptical eye, the jury chose to believe Davila and base its verdict on his testimony alone, that was its prerogative. Diggs v. United States, 9 Cir. 1915, 220 F. 545, aff'd, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442; Lyles v. United States, 5 Cir. 1957, 249 F.2d 744; Williams v. United States, 8 Cir. 1964, 328 F.2d 256.

■ Davila testified at trial that he was both a dope addict and a convicted felon (Rec. Vol. II, p. 202). That fact merited jury consideration, but did not, by itself, render Davila's testimony legally insubstantial.[12]

---

10. Recognizing the crucial importance of a limiting charge, the *Tillery* court observed that,

    "by failing to warn the jury about Padgett's reliability in this case, the trial court presented the evidence to the jury in an improper perspective, and the jury may have felt bound to accept it as true."

    411 F.2d at 648. The best indication that the *Tillery* court considered omission of an admonishing charge decisive was its holding that such failure was plain error (411 F.2d at 648). In the earlier case of Williamson v. United States, 5 Cir. 1964, 332 F.2d 123, this Court established the rule followed in *Tillery* that failure to admonish the jury to narrowly scrutinize the testimony of an accomplice is plain error.

11. The entire charge to the jury on accomplice testimony consisted of the following:

    "All evidence from a witness whose self-interest or attitude is shown to be such as might tend to prompt testimony unfavorable to an accused should be considered with caution and weighed with great care.

    "In this case one of the defendants, I previously told you, has entered a guilty plea and has testified. He would fall under what we call the category of an accomplice. He was one who admittedly was involved in this affair, this offense. So, I charge you that an accomplice is one who voluntarily and with common intent partici-

    pates with another person in the commission or planning of a crime. An accomplice does not become incompetent as a witness because of participation in the criminal act charged. On the contrary, the testimony of an accomplice alone, if believed by the jury, may be of such weight to sustain a verdict of guilty even though not corroborated or supported by other evidence. However, the jury should keep in mind that the testimony of an accomplice should be closely examined, received with caution, and weighed with great care.

    "On the other hand, if the jury believes the testimony of an accomplice to be true beyond a reasonable doubt, that testimony is sufficient to convict a defendant even though it is not corroborated by any other evidence. The jury should not convict a defendant upon the unsupported testimony of an accomplice unless it believes the unsupported testimony beyond a reasonable doubt."

    Rec. Vol. II, pp. 370–71.

12. In Williams v. United States, *supra*, p. 259, the court stated:

    "Miss Walker could be regarded as an accomplice in the commission of the offenses involved; she was a user of narcotics; she had a previous felony conviction for narcotic possession; and apparently the Government chose not to prosecute her in the present situation. These were matters which might influence her testimony. They would not, however, of themselves

## B) *The BRUTON Rule Violation*

During the course of the trial, two oral confessions attributed to Vargas and Gonzales respectively were admitted without objection by Morales.

Gonzales' confession, uttered voluntarily after completion of the sale, was revealed by Agent Wood in the following exchange at trial:

"A. Mr. Gonzales stated to himself and Agent Nattinger that he had been approached by Mr. Morales and Juan Davila to make a turkey package.

"Q. Would you explain to the jury and to me please what a turkey package is?

"A. A turkey package is a dumb package. In this case it would be, it was the heroin—it would be a dumb package of heroin which was the flour.

"Q. Did he tell you whether or not he was to receive anything for this?

"A. Yes, sir. He did. He said Mr. Morales and Mr. Davila were going to give him a thousand dollars for it."

(Rec. Vol. II, p. 168.) Gonzales' confession expressly charged Morales with knowledge that the package was fake, but not with knowledge of the agent's identity.

Vargas' "confession" consisted of the single, cryptic remark, "You have me in a conspiracy" (Rec. Vol. II, p. 86). Because of its ambiguity, that statement does not carry the incriminating force of Gonzales' confession, and, by itself, constitutes an insignificant link between Morales and the fraud.[13]

Morales contends that introduction of the confessions of Vargas and Gonzales, neither of whom testified at trial, violated his sixth amendment right to confrontation, recently delineated in Bruton v. United States, *supra*. We agree that admission of Gonzales' confession violated Morales' *Bruton* rights and, for that reason, reverse Morales' conviction.[14]

In *Bruton* the Supreme Court held that introduction of the extrajudicial confession of one codefendant which inculpated another violated the latter's right to confrontation when the confessor chose not to testify. The *Bruton* Court openly rejected the rationale of Delli Paoli v. United States, 1956, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278, that encroachment on the right to confrontation could be avoided by an instruction to the jury to disregard the confessor's statement incriminating the nonconfessor in determining the nonconfessor's guilt.[15] Instead, the Court ruled that such an admonition is intrinsically ineffective and held that admis-

---

make her testimony so legally unsubstantial or her credibility as a witness so legally infirm as to require reasonable doubt to be recognized as a matter of law."

In the present case, the trial judge's cautionary instructions to the jury on accomplice testimony adequately protected the defendants by subjecting Davila's testimony to close scrutiny.

13. Vargas' confession is ambiguous because it could mean several different things: that Vargas was caught in a conspiracy to sell heroin, that he was caught in a conspiracy to defraud a nongovernmental agent, or that he was caught in a plot to defraud the government. In addition, the term "conspiracy" might refer to a combination of only two persons or to individuals en-

tirely distinct from appellants. In other words, Vargas' "confession" does not directly inculpate anyone.

14. Improper admission of Gonzales' confession in itself requires reversal of Morales' conviction. Thus, the prejudicial effect of Vargas' statement on the jury's determination of Morales' guilt is academic.

However, the admissibility of Vargas' statement is important with respect to Gonzales' conviction, because (for reasons to be explained subsequently) Gonzales had no standing to attack the admission of his own confession on *Bruton* grounds.

15. In overruling Delli Paoli v. United States, the Court relied upon the principles expressed in Jackson v. Denno, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12

sion of the codefendant's inculpatory statement was reversible error in spite of the trial court's cautionary charge.

In the present case, the trial judge instructed the jury to disregard Vargas' statement in determining the guilt of appellants. (Rec. Vol. II, pp. 377, 378.) Inexplicably, he did not make a similar charge with respect to the more damaging statement of Gonzales. It is clear, however, that even had the jury been warned to ignore Gonzales' statement in determining Morales' guilt, admission of that statement would have violated the *Bruton* rule.

In two recent decisions, Harrington v. California, 1969, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284, and Schneble v. Florida, 1972, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340, the Supreme Court refused to overturn petitioner's conviction where a codefendant's confession was introduced at trial in violation of the *Bruton* rule, because the overwhelming evidence of petitioner's guilt rendered the *Bruton* violation "harmless error beyond a reasonable doubt." [16] While these decisions certainly confine the holding in *Bruton,* they do not dilute the admonition in Chapman v. California, 1967, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705, that constitutional errors affecting substantial rights cannot be considered harmless; and they are clearly inapplicable in a case such as this where the two extra-judicial statements constitute a significant portion of the evidence of guilt, supplemented only by the doubtful testimony of an accomplice.

Morales did not object to the introduction of Gonzales' oral confession at trial. Thus, he cannot raise the issue of the *Bruton* violation for the first time on appeal, unless the introduction of Gonzales' confession constituted plain error. Rule 52(b), F.R.Crim.P. In view of the importance attached to the right to confrontation by recent Supreme Court decisions, we hold that the denial of that right in this case was plain error.

Rule 52(b), F.R.Crim.P., states that, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Although several different definitions of "plain error" have been fashioned by the courts,[17] the ultimate decision whether or not to take notice of an error not raised below must depend on the facts of the particular case. Dupoint v. United States, 5 Cir. 1968, 388 F.2d 39, 45; Sykes v. United States, 5 Cir. 1966, 373 F.2d 607, cert. denied, 386 U.S. 977, 87 S.Ct. 1172, 18 L.Ed.2d 138.

The Supreme Court has not had occasion to decide whether a *Bruton* viola-

---

L.Ed.2d 908, and adopted Judge Hand's view that the limiting instruction is a recommendation to the jury to perform mental gymnastics beyond its powers.

16. In both cases, ample evidence was available to demonstrate petitioner's guilt without reliance upon his codefendant's confession. In Harrington v. California the evidence against petitioner included the testimony of several eyewitnesses placing him at the scene of the murder. In Schneble v. Florida the petitioner himself made a detailed confession.

17. See Wright, Federal Practice & Procedure: Criminal § 856, pp. 372, 373, where cases are cited variously defining "plain error" as, " 'error both obvious and substantial,' [82] or 'serious and manifest errors,' [83] or 'seriously prejudicial error,' [84] or 'grave errors which seri-

ously affect substantial rights of the accused'.[85]

"[82]. *Both obvious and substantial* Sykes v. United States, C.A.5th, 1966, 373 F.2d 607, 612.

"[83]. *Serious and manifest* Feutralle v. United States, C.A.5th, 1954, 209 F.2d 159, 163.

"[84]. *Seriously prejudicial* Cleaver v. United States, C.A.10th, 1957, 238 F.2d 766, 770. Himmelfarb v. United States, C.A.9th, 1949, 175 F.2d 924, 950, certiorari denied 70 S.Ct. 103, 338 U.S. 860, 94 L.Ed. 527.

"[85]. *Grave errors affecting substantial rights* Wright v. United States, C.A.10th, 1962, 301 F.2d 412, 414."

See also Moore's Federal Practice § 52.02(2),

tion constitutes plain error, but the language used in the *Bruton* line of cases demonstrates the Court's strong commitment to correcting the "serious flaw" created by admission of a *Bruton*-type confession. In *Bruton, supra,* 391 U.S. at 137, 88 S.Ct. at 1628, the Supreme Court observed that "the introduction of Evans' confession posed a *substantial threat* to petitioner's right to confront the witnesses against him" [emphasis added], and the Court reiterated the importance of that right when it held the *Bruton* rule retroactive in Roberts v. Russell, 1968, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100, stating that,

> "Despite the cautionary instruction, the admission of a defendant's confession which implicates a codefendant results in such a *'serious flaw.'* The retroactivity of the holding in *Bruton* is therefore required; the error *'went to the basis of fair hearing* and trial because the procedural apparatus never assured the [petitioner] a fair determination' of his guilt or innocence."

(Emphasis added.)   (392 U.S. at 294, 88 S.Ct. at 1922).[18]

In view of the importance accorded the *Bruton* rule by the Supreme Court, coupled with the fact that Gonzales' confession represents one of the chief links between Morales and the fraud, we hold that introduction of Gonzales' confession seriously impaired Morales' right to a fair trial and, therefore, was plain error.[19]

---

18. In United States v. Davis, 1972, 459 F.2d 167, 172, the Sixth Circuit (in dictum) predicted our holding here, reasoning that,
    "The *Bruton* rule, applied retroactively in Roberts v. Russell [citation omitted] seeks to avoid a serious flaw in the fact-finding process at trial. Any violation of that rule · might, therefore, present an appropriate occasion for the recognition of a plain error."

19. Since the existence of plain error depends on the facts of the particular case, our holding that introduction of Gonzales' confession constituted plain error in no way creates a hard and fast rule. In another case, where the evi-

## GONZALES' CONVICTION

### A) *The Accomplice Testimony*

Gonzales, like Morales, contests the propriety of allowing the jury to convict on the uncorroborated testimony of Davila. For the reasons expressed previously, we believe the trial court properly followed the procedure set out in *Tillery, supra,* obviating any argument that Davila's testimony was erroneously submitted to the jury.

### B) *Application of the BRUTON Rule*

■ In his brief on appeal, Gonzales duplicates Morales' argument and claims that both his own confession and that of Vargas were introduced in violation of the *Bruton* rule. However, Gonzales has no standing to attack the introduction of his own confession on *Bruton* grounds.[20] The rule enunciated in *Bruton* stems from the right to confrontation and is designed to protect the nontestifying confessor's codefendant, not the confessor himself.

■ Of course, Gonzales does have standing to question the introduction of Vargas' statement on *Bruton* grounds. But Gonzales did not object to the admission of Vargas' statement at trial, and that statement added very little weight to the government's case against Gonzales.[21] For that reason, we hold that introduction of Vargas' statement which, unlike that of Gonzales, only tenuously connected appellants with the crime, did not constitute a sufficiently

dence of guilt is stronger or the incriminatory implication of the confession weaker, introduction of such a statement might not undermine the fairness of the trial.

20. In his brief and argument on appeal, Gonzales does not question the voluntariness of his own confession, but instead mimics Morales' argument that its admission violated the *Bruton* rule.

21. Compare the situation in *Bruton, supra,* 391 U.S. p. 127, 88 S.Ct. p. 1623, where the Court noted that,
    "Plainly, the introduction of Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination."

serious flaw to rise to the level of plain error.

### C) *Entrapment*

Gonzales raises the additional defense of entrapment. A careful study of the record indicates that Davila might have tricked his compatriots, but the facts do not suggest entrapment. No government official implanted in Gonzales' mind the disposition to commit this crime. Sherman v. United States, 1958, 356 U.S. 369, 78 S.Ct. 819, 2 L. Ed.2d 848; Sorrells v. United States, 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L. Ed. 413; 73 Harv.L.Rev. 1333 (1960). Nor does the factual pattern of this sale indicate impermissibly vigorous government involvement sufficient to constitute entrapment as a matter of law. United States v. Bueno, 5 Cir. 1971, 447 F.2d 903.

Accordingly, the judgment of conviction of Gonzales is affirmed, while the judgment of conviction of Morales is reversed, and the case as against Morales is remanded for another trial.

Affirmed as to Gonzales; reversed and remanded as to Morales.