674 F.2d 469
 10 Fed. R. Evid. Serv. 449
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jorge E. ESCOBAR, David Earl Ervin, Sr., Michael Richard
Layman, Eladio Jorge Alonso, Tomas Alfredo Lastre, Danilo J.
Perez, Luis Ferro-Perez, John Walter Sparrow, Armando
Ernesto Herrera a/k/a Armando Pedro Alanis, Jose Edward
Alanis, Rolando Ortiz-Costumero and Hector Ricardo Manso,
Defendants-Appellants.
 No. 81-4059.
 United States Court of Appeals,
Fifth Circuit.
 April 30, 1982.
 
 James K. Dukes, Hattiesburg, Miss., Harold F. Keefe, Coral Gables, Fla., Ronald A. Dion, No. Miami Beach, Fla., for defendants-appellants.
 Jerry A. Davis, Asst. U.S. Atty., Biloxi, Miss., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before CLARK, Chief Judge, THORNBERRY and GARZA, Circuit Judges.
 GARZA, Circuit Judge:
 
 
 1
 In a four-count indictment, appellants were charged with conspiracy to import marihuana into the United States,[1] conspiracy to possess marihuana with the intent to distribute,[2] importation of marihuana[3] and possession of marihuana with the intent to distribute.[4] After pleading not guilty, the case went to trial; with the exception of Manso, appellants were found guilty on all four counts. Manso was found guilty on all counts except possession. On this appeal, appellants contend that the trial court committed reversible error on several occasions. Because we find some of these allegations meritorious, the decision below is affirmed in part and reversed in part.
 
 Facts
 
 2
 As a result of increased drug smuggling activity in the Slidell area, the Louisiana State Police implemented a smuggling profile based on past experience that focused surveillance on out-of-state, four-wheel drive vehicles equipped with radio and driven by Latins. Using that profile, one Louisiana officer observed two vehicles which he felt warranted further investigation: a red and silver six-wheel vehicle and a black GMC pickup pulling a boat and trailer with Florida registration. Both were being driven by Latin-looking males. A quick check on the vehicles' registration revealed that they were registered to appellant Hector Manso. Manso's name was then run through the police computer where it was further revealed that he had a prior record and was a suspected narcotics smuggler. When this was established, the officer followed the two vehicles to a farm located in Clifton, Louisiana. There, he noticed a green six-wheel Sears truck with another boat. At this point, a constant surveillance was established.
 
 
 3
 Throughout that day a large amount of activity was observed at the farm house with numerous people coming and going. A traffic stop disclosed that appellant Danilo Perez and Cameron Sprowls, an indicted co-defendant who remains a fugitive, were driving one of the observed vehicles.
 
 
 4
 On August 6, 1981, Manso and Sprowls transported one of the boats-a 23-foot white pleasure craft-from the farm in Clifton to the Gulf View Motel in Long Beach, Mississippi, where they registered in Sprowls' name. The surveillance intensified as agents of the Drug Enforcement Administration, Mississippi Bureau of Narcotics, and U. S. Customs officers were called upon for assistance. This surveillance revealed numerous trips between the farm in Clifton, Louisiana, and the motel involving the black GMC truck and a 1977 Chevrolet pickup. In addition, the 23-foot white boat, two green john boats[5] and the six-wheel Sears truck were brought to a site along the Wolf River in Mississippi. Appellants Manso, Perez, Alonso and Armando Alanis were observed in association with the vehicles and boats, as well as with each other at the Gulf View Motel.
 
 
 5
 During this time, surveillance was not limited to the ground. On August 10th, a U. S. Customs plane also observed Manso's black pickup carting around a green john boat with a large Mercury outboard motor on it. Losing sight of it after it went into a wooded area along the northern bank of the Wolf River, the Customs agents made the decision to proceed south into the Gulf of Mexico for a routine surveillance of an area in which smuggling activities had been observed in the past. There, the SAINT ANNE, a shrimp boat, was observed. Attention was drawn to the vessel because it was proceeding in a direction opposite that traveled by boats involved in shrimping activities during that time of day. Continued air surveillance of the SAINT ANNE throughout the night revealed that it had rendezvoused with several small boats. Although darkness prevented positive identification of the smaller boats from the air, a U. S. Customs ship later observed a white boat and green john boat similar to the ones transported into Mississippi from Louisiana in the area in question.
 
 
 6
 Shortly thereafter, around 6:30 a. m., a Mississippi Bureau of Narcotics agent stationed at the Bay of St. Louis Bridge spotted a large green john boat containing five individuals and numerous bales of material suspected to be marihuana. Appellant Ortiz was identified as being on the boat by the brown pullover terry cloth shirt he was wearing. Approximately ten minutes later, the same boat was seen further north by a DEA agent stationed at a bridge on Menge Road over the Wolf River. This agent was also able to identify appellant Ortiz by his distinctive clothing.
 
 
 7
 After this last observation, DEA and Mississippi Bureau of Narcotics agents proceeded to converge on the suspected landing site previously located on the Wolf River. Upon arrival, the agents observed the black GMC truck, the 1977 red and silver Chevrolet truck, the green Sears truck and two boat trailers. Several individuals fled the area and eighty-six bales of marihuana were discovered in the rear of the Sears truck. Arrested at the loading site were appellants Luis Ferro-Perez, Jimmy Velez-Cuenca[6] and John Sparrow, as well as three juvenile Colombian women.[7]
 
 
 8
 At approximately the same time, Customs officers seized the white pleasure craft in the Bay of St. Louis; approximately twenty bales of marihuana were aboard, and appellants Perez and Armando Alanis were arrested. Also seized in an area near the mouth of the Wolf River was a green john boat similar to the one reported leaving the area of the SAINT ANNE earlier that day. While this boat was barren of bales, gleanings of marihuana were found on its bottom; appellants Lastre and Jose Alanis were arrested. Finally, U. S. Customs agents boarded the SAINT ANNE as it docked in Gulfport. Marihuana residue was discovered on board, and the agents arrested appellants Ervin, Layman, Escobar and Alonso.[8] Further examination revealed a chart which indicated that the vessel arrived from outside the United States, and a radio identical to the one found in Manso's black GMC truck.
 
 
 9
 Ortiz was arrested later that day in the Menge Road area; he was scratched, wet and dressed in the same brown pullover earlier identified by the agents stationed at the two bridges. A subsequent search of the white boat revealed a business card bearing Ortiz's name. When the Gulf View Motel rooms were later searched pursuant to a warrant, invoices were discovered which evidenced the recent purchase of two john boats. Also discovered was a Louisiana boat registration in the name of Jose Perez with a number identical to that found on the green john boat previously seized. Registration forms for the vehicles seized at the landing site were also found.
 
 The Computer Records
 
 10
 During direct examination of Tom Fisher, the Louisiana officer who initiated surveillance, the government sought to elicit those observations which focused the officer's attention on Manso. In responding to the government's question, the officer, perhaps overzealously, exceeded the scope of the question and began narrating how he ran Manso's name through different computers. The following colloquy then took place:
 
 MR. KEEFE (defense counsel):
 
 11
 Excuse me. Objection, Your Honor, to what the results of any computers or anything else as hearsay.
 
 THE COURT:
 
 12
 I'll overrule your objection.
 
 MR. DAVIS (the prosecutor), Continuing:
 
 13
 Q. Go ahead.
 
 
 14
 A. I checked into the computer the name Hector Manso to see if it was a known subject, to determine if the subject had any prior record of dealing with narcotics.
 
 
 15
 MR. KEEFE:Objection, Your Honor, to anything that he learned from a computer as total hearsay.
 
 THE COURT:
 
 16
 Overruled.
 
 
 17
 A. Through the computer and through teletypes I received back I learned that the subject Hector Manso did have a prior record and was entered in the computer as being a suspected narcotics smuggler and had a boat owned by him seized in May of 1980 with marihuana gleanings.
 
 MR. KEEFE:
 
 18
 Your Honor, I would object to that as hearsay and move for a mistrial.
 
 THE COURT:
 
 19
 I'll overrule your objection.
 
 
 20
 Two problems with the admission of this testimony immediately present themselves: hearsay and improper use of prior offenses. Since the officer was allowed to testify as to what he learned from the computer, his statements were beyond doubt, inadmissible under the hearsay rule. See United States v. Davis, 568 F.2d 514 (5th Cir. 1978); United States v. Black, 436 F.2d 838 (5th Cir. 1971); and United States v. Johnson, 413 F.2d 1396 (5th Cir. 1969). At the heart of the hearsay rule is the policy against depriving a party of his right to cross-examine a witness. No clearer case than the present one exists which epitomizes a deprivation of that right. The computer records indicated that Manso was "a suspected narcotics smuggler." The word "suspected" leaves too large a gap for defense counsel to fill when the witness is unable to testify as to the accuracy and thoroughness of the procedures used to arrive at that label. Such a burden should never be required.
 
 
 21
 The officer was also improperly permitted to refer to Manso's prior record. Extrinsic offense evidence is never admissible to show that a defendant had a bad character or propensity to commit the crime in issue, although it may be admissible for some other relevant purpose. Fed.R.Evid. 404(b).[9] See United States v. Witt, 618 F.2d 283 (5th Cir. 1980), cert. denied, 449 U.S. 882, 101 S.Ct. 234, 66 L.Ed.2d 107 (1980); United States v. Beechum, 582 F.2d 898 (5th Cir. 1978), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); United States v. Bloom, 538 F.2d 704 (5th Cir. 1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 814, 50 L.Ed.2d 792 (1977). We have also recognized that such other-crime evidence may not be received unless it is relevant to an actual issue in the case and unless its probative value on that issue is not outweighed by its unfair prejudice to the defendant. See United States v. De La Torre, 639 F.2d 245 (5th Cir. 1981); United States v. Killian, 639 F.2d 206 (5th Cir. 1981), cert. denied, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); United States v. Dunbar, 614 F.2d 39 (5th Cir. 1980), cert. denied, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980); and United States v. Jimenez, 613 F.2d 1373 (5th Cir. 1980). See also Fed.R.Evid. 403.[10]
 
 
 22
 The prejudicial impact of the officer's statement in the case at hand is without question. Although it was acknowledged that Manso did indeed have a prior record, there was no mention of the specific offense he committed. This statement coupled with the allegation in the same sentence that Manso was "a suspected narcotics smuggler," would no doubt lead the jury to believe that the current charges against him were merely the most recent in a series of drug related offenses. No attempt was made by the government to show that the admission of this reference was for any purpose other than to tar Manso. While this Court is far from convinced of appellant's sterling innocence, the potential for inflammatory prejudice mandates that prior offense evidence be restricted to its proper bounds.
 
 
 23
 It is the government's position that, even if the district court erred in admitting the officer's testimony, we should not vacate Manso's conviction under this second theory because appellant failed to object. But as we have already noted in United States v. Brown, 548 F.2d 1194, 1207-08 (5th Cir. 1977):
 
 
 24
 This Court, however, can recognize plain errors or defects affecting substantial rights even if there is no timely objection at trial. F.R.Crim.P. 52(b). See, e.g., United States v. Morales, 5 Cir., 1973, 477 F.2d 1309, 1315; United States v. Collins, 5 Cir., 1972, 472 F.2d 1017, 1018; United States v. Garber, 5 Cir., 1972, 471 F.2d 212, 217; United States v. Jacquillon, 5 Cir., 1972, 469 F.2d 380, 386. As the name implies, plain errors "are those involving serious deficiencies which affect the fairness, integrity or public reputation of the judicial proceedings or which constitute obvious error." United States v. Collins, supra, at 1018; United States v. Jacquillon, supra, at 386. Such a strict standard "is necessary in order to promote efficient judicial administration and to prevent parties from gambling for favorable verdicts and then resorting to appeal on errors that might have easily been corrected by objection at trial." Id. Whether or not we will take notice of an error not raised below ultimately "must depend on the facts of the particular case." United States v. Morales, 5 Cir., 1973, 477 F.2d 1309, 1315.
 
 
 25
 The facts of the instant case reveal that defense counsel arduously tried to prohibit any reference of the computer records during trial. A correct theory was used, i.e. hearsay, but unfortunately, not the only one applicable. There was no hint that defense counsel deliberately avoided making proper objections in an attempt to later sandbag the prosecution. See United States v. Brown, 548 F.2d at 1208 n.27. Furthermore, there was no limiting instruction by the Court. See United States v. Garber, 471 F.2d 212, 217 (5th Cir. 1972).[11] Under the circumstances of this case, we conclude that the admission of the officer's testimony was plain error necessitating reversal of Manso's conviction and remand for a new trial.[12]
 
 
 26
 The only remaining point to be addressed is the possible effect these statements may have had on the other appellants' convictions. Appellants claim that when extrinsic offense evidence was improperly admitted as to Manso, it also contaminated them by reason of the fact that in all likelihood the jury drew an adverse inference against them because of their association with Manso. While this argument has some merit, this Court does not believe that the level of contamination in this case rose to a level which would warrant reversal.
 
 
 27
 Whenever there is a multi-defendant trial, there is always the risk that evidence admitted against one defendant will adversely affect the interests of another. Courts have been willing to accept the risk of some adverse effects upon co-defendants in order to secure the public benefits of savings in costs, time, and judicial resources, along with reduced burdens on disinterested witnesses. See, e.g., United States v. McLaurin, 557 F.2d 1064, 1074 (5th Cir. 1977), cert. denied, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978). However, any adverse effects must be minimized. The extent of the prejudice to a co-defendant from evidence of one defendant's prior acts depends on an assessment of how that evidence might affect the jury's consideration of a co-defendant's guilt. This requires a review of the record as a whole.
 
 
 28
 A review of the record in the instant case reveals that in its charge the district court instructed that in determining whether a defendant was a member of the conspiracy, the jury should consider that evidence, if any, pertaining to his own acts or statements.[13] Furthermore, the jury was instructed not to consider any acts or conduct on the part of the defendants not alleged in the indictment,[14] and that the guilt or innocence as to each defendant on each of the four counts charged was to be made separately.[15] When the officer's testimony was improperly admitted, it was not stressed and there was no indication that any of the other defendants was mentioned in connection with it or associated with Manso during the time the previous crime was committed. See United States v. Albert, 595 F.2d 283, 289 (5th Cir. 1979), cert. denied, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979). Finally, the government's evidence against the other co-defendants was strong and not based upon the credibility of this single witness. See United States v. Figueroa, 618 F.2d 934 (2nd Cir. 1980). In light of the above, we hold that there was no reversible error as to these other defendants.
 
 The Sufficiency of the Evidence
 
 29
 At the end of the government's case, both defense lawyers moved for a judgment of acquittal on behalf of their clients based upon insufficient evidence. Both motions were denied, and, after conferring overnight, counsel for the defense decided to rest their case. The remainder is history. On this appeal, defense counsel chose to make a similar argument, but only with respect to four of the appellants: Ervin, Layman, Alonso and Escobar. After reviewing the record, we arrive at the same conclusion as the district court.[16]
 
 
 30
 The standard for reviewing the sufficiency of the evidence is whether "there is substantial evidence taking the view most favorable to the government to support it." Hamling v. United States, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Bland, 653 F.2d 989, 995 (5th Cir. 1981); and United States v. Malatesta, 590 F.2d 1379, 1382 (5th Cir. 1979) (en banc), cert. denied, 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979). If, after reviewing the evidence, and inferences that may reasonably be drawn from it, in the light most favorable to the government, it appears that the trier of fact could reasonably infer that the appellant was guilty beyond a reasonable doubt, then his conviction must be affirmed. United States v. Fox, 613 F.2d 99, 101 (5th Cir. 1980). Beyond a reasonable doubt does not mean, as so many counsels for the defense would have us believe, beyond any doubt. It is always possible to fabricate some hypothetical scenario which would otherwise explain the result. The issue is whether reasonable minds could have found the evidence inconsistent with every reasonable hypothesis of innocence. United States v. Bland, 653 F.2d at 995; United States v. Burgin, 621 F.2d 1352, 1357 (5th Cir. 1980); United States v. Haggins, 545 F.2d 1009, 1012 (5th Cir. 1977). We do not believe such a situation exists here.
 
 
 31
 The first point to consider is whether the jury properly concluded that the 7,920 pounds of marihuana recovered was actually brought up from Colombia aboard the SAINT ANNE. There was testimony concerning one crew member's admission that he knew that marihuana was on the vessel and that he had been offered a sum of money to accompany this boat to the United States and to work as a mechanic on the ship.[17] This testimony, however, was made outside the presence of the jury and may not properly be considered in evaluating the sufficiency of the evidence. There was, however, an abundance of circumstantial evidence linking the marihuana to the SAINT ANNE.
 
 
 32
 It has long been held that participation in a criminal conspiracy need not be proven by direct evidence; circumstantial evidence may support a jury's findings. Glasser v. United States, 315 U.S. at 80, 62 S.Ct. at 469; United States v. Willis, 639 F.2d 1335, 1338 (5th Cir. 1981); United States v. Malatesta, 590 F.2d at 1381; United States v. Littrell, 574 F.2d 828, 832 (5th Cir. 1978); and United States v. White, 569 F.2d 263, 266 (5th Cir. 1978), cert. denied, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). Furthermore, the test for judging the sufficiency of the evidence is the same whether the evidence is direct or circumstantial. United States v. Bland, 653 F.2d at 996; United States v. Gonzalez, 617 F.2d 104, 106 (5th Cir. 1980), cert. denied, 449 U.S. 868, 101 S.Ct. 202, 66 L.Ed.2d 86 (1980); and United States v. Smith, 546 F.2d 1275, 1283-84 n.2 (5th Cir. 1977).
 
 
 33
 Highlighting some of the circumstantial evidence already noted in this opinion's facts section, we note that a ship's chart which was seized revealed that the SAINT ANNE had just sailed from a point outside the United States.[18] Although a shrimp boat, the SAINT ANNE was not engaged in any shrimping activity. In fact, what originally drew suspicion to it was the fact that it was seen leaving a shrimping area at a time when it should have been entering it. A radio was found aboard which was identical to the one found in Manso's black GMC pickup. The ship was seen rendezvousing late at night with several small boats which could reasonably be inferred to be the same ones later seized with marihuana bales aboard or seen with what seasoned officers suspected were marihuana bales. One of the SAINT ANNE's crew members was arrested at a landing site where eighty-six bales were recovered from the back of a green Sears truck. When the ship was boarded by U. S. Customs officers after it docked at Gulfport Harbor, marihuana residue was found both on the deck and in the ship's hold. Finally, the ship's master, appellant Ervin, was unable to supply those officers upon request with either proper documentation on the boat or identification of himself. In light of the above, this Court finds that the evidence supports the finding that the marihuana in question was transported by the SAINT ANNE.
 
 
 34
 The above finding immediately proves to be appellant Ervin's downfall. As already noted, Ervin himself acknowledged that he was master of the SAINT ANNE. As this Court has recently stated: "(T)he jury may, nevertheless, properly infer that the captain (or master) of a vessel is aware of the nature of his cargo." United States v. Willis, 639 F.2d at 1339. See also United States v. Bland, 653 F.2d at 996; and United States v. Sanchez, 634 F.2d 938 (5th Cir. 1981).
 
 
 35
 More difficult, perhaps, is the finding of sufficient evidence to support the convictions of Layman, Alonso and Escobar. Appellants point out that they were not observed unloading the bales and that no marihuana was found on their persons when they were taken into custody. Their contention is that mere presence and association is insufficient to convict them of conspiracy. United States v. Bland, 653 F.2d at 996; United States v. Willis, 639 F.2d at 1339; United States v. Reyes, 595 F.2d 275, 280-81 (5th Cir. 1979); and United States v. Littrell, 574 F.2d at 833-34. Our response is that more than "mere presence" has been established in the instant case. The ship left some foreign port with a cargo of at least four tons of marihuana; it docked in Gulfport Harbor, Mississippi, without it. As already noted, there was an overabundance of circumstantial evidence indicating that the cargo was unloaded shortly before docking. Moreover, it was accomplished in a minimum amount of time. The sheer bulk of the cargo precludes the argument that the crew of the SAINT ANNE was ignorant of the unloading, and the time period in which it was done indicates that they no doubt assisted in the operation. All of these were factors from which the jury could reasonably find guilt beyond a reasonable doubt.[19] Accordingly, their convictions are sustained.
 
 The State Investigation Reports
 
 36
 During cross-examination, Officer Tom Fisher of the Louisiana Police testified that it was his habit to maintain a daily log on cases he was assigned to in order that he might accurately record his activities and observations. This log was an essential tool used by Fisher when preparing his reports. When asked why he had failed to bring to trial his log or reports relating to the instant case, Fisher replied, "I saw no reason to, sir. I remembered all the events that I thought I would need to testify to."[20] Thereafter, at the end of his testimony and outside the presence of the jury, defense counsel moved that the witness' testimony be stricken for failure of the government to comply with the Jencks Act.[21] After the court opined that it did not believe the reports to be Jencks material, the motion was denied.
 
 
 37
 The issue on this appeal is whether the Act covers these reports. We find, at least in this Circuit, that it does not. Appellants refer us to the Tenth Circuit's decision of United States v. Heath, 580 F.2d 1011 (10th Cir. 1978). There it was stated that reports which are in the possession of state authorities, especially where there is a joint state and federal investigation, are covered under the Act. Id. at 1018-19. What defense counsel did not refer us to, however, was the following footnote accompanying that passage:
 
 
 38
 We recognize that there is authority to the contrary. Courts in several circuits have indicated that a statement in the hands of local police is not a statement in the possession of the federal prosecutor within the meaning of the Jencks Act. See United States v. Higginbotham, 539 F.2d 17 (9th Cir. 1976) (dicta); United States v. Smith, 433 F.2d 1266 (5th Cir. 1970), cert. denied, 401 U.S. 977, 91 S.Ct. 1206, 28 L.Ed.2d 328 (1971); Beavers v. United States, 351 F.2d 507 (9th Cir. 1965) (but court held the material in question was not a "statement" within the meaning of the Act and that Jencks was inapplicable anyway); United States v. Harris, 368 F.Supp. 697, 708-9 (E.D.Pa.1973), aff'd, 498 F.2d 1164 (3d Cir.), cert. denied, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974).
 
 
 39
 Id. at 1019 n.1. A review of this Circuit's case law post-dating our United States v. Smith decision does not reflect a change of heart in our outlook on the matter. This theory for reversal is therefore spurious.
 
 
 40
 Appellants also claim that reversal is required because the trial court refused to hold an in camera inspection after defense counsel made a specific Brady demand for the production of these documents. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Contrary to the assertions by the appellants, there was no specific Brady demand for this material made at trial; the only request for production was pursuant to the Jencks Act. In fact, although the appellants failed to make a specific request for Brady material prior to trial, the government voluntarily provided all Fed.R.Crim.P. 16 and Brady material. The reports requested at trial were never in the possession of the United States, and there is no indication that the material would contain information relative to the guilt or innocence of the appellants or to punishment. The Brady rule does not require the prosecution to search the files of a state police office for exculpatory evidence. See United States v. Edgewood Health Care Center, Inc., 608 F.2d 13, 14-15 (1st Cir. 1979), cert. denied, 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980).
 
 
 41
 Motion For Mistrial When Defendant Layman Was Seen Shackled
 
 
 42
 After defendants rested their case, a motion for mistrial was made based upon the fact that appellant Layman was briefly observed by two jurors while being transported by U. S. Marshalls in handcuffs. Because of the possible prejudicial effect of this view, Layman argues that he is entitled to a new trial. We disagree. Our decision of United States v. Diecidue, 603 F.2d 535, 549-50 (5th Cir. 1979), cert. denied sub nom. Antone v. United States, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980), is dispositive of the issue and, rather than try to improve upon it, we quote the following language since it is equally applicable to the case at hand:
 
 
 43
 Defendants accused of crimes are, of course, entitled to physical indicia of innocence in their jury trials. This Court has declared, however, that brief and inadvertent exposure to jurors of defendants in handcuffs is not so inherently prejudicial as to require a mistrial, and defendants bear the burden of affirmatively demonstrating prejudice. Wright v. State of Texas, 533 F.2d 185, 187 (5th Cir. 1976).
 
 
 44
 The conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial. See United States v. Theriault, 531 F.2d 281, 284 (5th Cir.), cert. denied, 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976). Defendants have made no showing of actual prejudice, nor will we assume any from the circumstances surrounding the (incident). See Dupont v. Hall, 555 F.2d 15, 17 (1st Cir. 1977). Defendants failed to request examination of jurors in order to determine who had seen defendants in shackles or to exclude those whose impartiality might be affected. See Wright v. State of Texas, 533 F.2d at 187; United States v. Taylor, 562 F.2d (1345) at 1359. Neither was any request made for a cautionary instruction. The trial court was clearly not in error in denying the motions for mistrial.
 
 
 45
 Improperly Imposed Special Parole Terms Upon Conspiracy Convictions
 
 
 46
 As their last argument on this appeal, appellants note that it is generally accepted that special parole terms may not be given upon conviction of conspiracy to import marihuana into the United States. Bifulco v. United States, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980); United States v. Dorr, 636 F.2d 117 (5th Cir. 1981); United States v. Grammatikis, 633 F.2d 1013 (2nd Cir. 1980); United States v. Beinvenue, 632 F.2d 910 (1st Cir. 1980); Cates v. United States, 626 F.2d 399 (5th Cir. 1980); and United States v. Bourden, 624 F.2d 77 (9th Cir. 1980). Nor may a special parole term be imposed upon conviction for conspiracy to possess with intent to distribute marihuana. Smith v. United States, 635 F.2d 693 (8th Cir. 1980), cert. denied, 450 U.S. 934, 101 S.Ct. 1397, 67 L.Ed.2d 368 (1981); United States v. Alvarez, 626 F.2d 208 (1st Cir. 1980); United States v. Ulano, 625 F.2d 1383 (9th Cir. 1980); United States v. Wylie, 625 F.2d 1371 (9th Cir. 1980), cert. denied, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); and United States v. Middlebrooks, 624 F.2d 36 (5th Cir. 1980). As to several of the appellants, the trial court issued orders requiring special parole terms without specifying whether the special parole term was added to the substantive or conspiracy counts. Appellants assert that a remand is required for clarification. Commendably, the government concedes this issue.
 
 
 47
 AFFIRMED IN PART AND REVERSED IN PART; REMANDED.
 
 
 
 [1]
 21 U.S.C. §§ 952(a) and 960(a)(1)
 
 
 [2]
 21 U.S.C. § 846
 
 
 [3]
 21 U.S.C. §§ 952(a) and 960(a)(1); 18 U.S.C. § 2
 
 
 [4]
 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2
 
 
 [5]
 A large, flat-bottomed, aluminum boat
 
 
 [6]
 After his arrest, Velez waived his Miranda rights and informed his arresting officer that he had left Colombia on board the fishing vessel SAINT ANNE. He further stated that he knew marihuana was on board and that he had been offered a sum of money to accompany this cargo to the United States. It was Velez's intention to thereafter return to Colombia and use his share of the money to buy a taxicab. His dream was to be a taxi driver. Record, vol. 14, at 192-98
 
 
 [7]
 The three juvenile females that were arrested were subsequently deported for being in this country illegally. Record, vol. 14, at 138
 
 
 [8]
 Ervin acknowledged himself to be the master of the vessel. Record, vol. 15, at 263
 
 
 [9]
 Fed.R.Evid. 404(b) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 [10]
 The Advisory Committee Notes to Rule 404(b) specify that there is no mechanical rule as to whether such evidence is to be admitted. Rather, "(t)he determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403."
 The Advisory Committee Notes to Rule 403 state that "(i)n reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction." The record in the instant case fails to reveal any limiting instruction which might have ameliorated the prejudicial nature of reference to Manso's prior record. Although this Court has taken the position that a judge should carefully limit the use of extrinsic offense evidence whenever any possibility of undue prejudice exists, see, e.g., United States v. Jimenez, 613 F.2d 1373, 1377 (5th Cir. 1980); United States v. Contreras, 602 F.2d 1237, 1240 (5th Cir. 1979), cert. denied, 444 U.S. 971, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979); United States v. Aleman, 592 F.2d 881, 886 (5th Cir. 1979); United States v. Underwood, 588 F.2d 1073, 1076-77 (5th Cir. 1979); we currently decline to reach the issue as to whether the district court's failure to give such instruction, in the absence of a request, constitutes error. United States v. Bosch, 584 F.2d 1113, 1118 n.2 (1st Cir. 1978); United States v. Fosher, 568 F.2d 207, 210 n.12 (1st Cir. 1978).
 
 
 [11]
 See also note 10 supra
 
 
 [12]
 Nor can we say that admission of the computer records was harmless error. It seems fairly clear that there was sufficient evidence, apart from the impermissible testimony, upon which the jury could have convicted Manso on each count of the indictment here. However, as one Court has stated:
 (T)he test of whether an error is harmless is not whether, on the required review of the entire record, Kotteakos v. United States, supra, 328 U.S. (750) at 762, 764, 66 S.Ct. 1239 (at 1246, 1247, 90 L.Ed. 1557) the appellate court believes that, disregarding the erroneously introduced evidence, there was other evidence which was independently sufficient to establish the defendant's guilt. Instead, the standard involves an analysis of the manner in which, in the total setting of the case, the error influenced the jury.
 United States v. Ruffin, 575 F.2d 346, 358-59 (2nd Cir. 1978). And as that Court also went on to say, quoting Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946): "Only if 'our conviction is sure that the error did not influence the jury or had but very slight effect' " can Manso's convictions be affirmed. Id. at 360. Here that cannot be said.
 
 
 [13]
 Record, vol. 15, at 365. See also United States v. Albert, 595 F.2d 283, 289 (5th Cir. 1979), cert. denied, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979)
 
 
 [14]
 Record, vol. 15, at 375
 
 
 [15]
 Record, vol. 15, at 352
 
 
 [16]
 When presented with the two motions, the district court had this to say to defense counsel outside the presence of the jury:
 Well, Counsel, with all deference to both of you, I certainly feel that there's more than enough evidence here to convict every one of your clients, both of the importation and of the conspiracy. And I so hold and overrule your motion. Record, vol. 15, at 310.
 
 
 [17]
 Record, vol. 14, at 197-98. See note 6 supra
 
 
 [18]
 As already indicated, testimony outside the jury's hearing revealed that the SAINT ANNE had just left Colombia. Record, vol. 14, at 197
 
 
 [19]
 Examples of other recent cases in which the convictions of crew members were upheld by circumstantial evidence include United States v. Freeman, 660 F.2d 1030 (5th Cir. 1981); and United States v. Alfrey, 620 F.2d 551 (5th Cir. 1980), cert. denied, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980)
 
 
 [20]
 Record, vol. 14, at 31
 
 
 [21]
 18 U.S.C. § 3500(b) provides that
 After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
 (emphasis added).