[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-11281

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 9, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-00377-CR-4-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PATRICK BLASINGAME,
NICHOLAS BRADLEY,

Defendant-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(March 9, 2007)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and LAWSON,[*] District Judge.

PER CURIAM:

_____

[*] Honorable Hugh Lawson, United States District Judge for the Middle District of Georgia,
sitting by designation.

Following a jury trial, Patrick Blasingame and William Nicholas Bradley were each convicted of one count of conspiracy to commit the robbery of a business involved in interstate commerce, in violation of 18 U.S.C. § 1951, and one count of using or possessing a firearm in the commission of a violent felony, in violation of 18 U.S.C. § 924(c). Blasingame was sentenced to a total of nineteen years imprisonment, and Bradley was sentenced to a total of sixteen years and two months imprisonment. Blasingame independently raises two issues on appeal: (1) the district court plainly erred in allowing the introduction of a non-testifying co-defendant's confession, which implicated Blasingame;  and (2) the district court erred in allowing the admission of a photograph depicting Blasingame's gunshot wound and tattoo.

Bradley independently raises five issues on appeal: (1) the district court informed the jury of Bradley's incarceration in violation of his due process rights; (2)  the district court erred in denying Bradley's Motion for Severance; (3) the district court erred in allowing a government agent to testify that a witness refused to testify out of fear; (4) the district court erred in allowing prosecutors to improperly cross examine Bradley's alibi witnesses; and (5) the district court erred in allowing the prosecutors to read several witnesses' prior testimonies aloud.  In addition, both Defendants appeal their sentences pursuant to United States v.

<u>Booker</u>, 543 U.S. __, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). For the reasons explained herein, we find no reversible error and affirm both Defendants' convictions and sentences.

## I. BACKGROUND

On April 8, 2003, a federal grand jury returned a two-count superseding indictment charging Defendants Blasingame and Bradley along with five other co-conspirators[1] in Count One with conspiracy to commit robbery of a business involved in interstate commerce, and in Count Two with using and carrying a firearm. Both Defendants pled not guilty at arraignment and were incarcerated pending trial. A jury trial was held beginning October 27, 2003.

At trial, Milton Prince and Paul Sampleton, both employees of Brinks Armored Car Company, recounted the events that took place during the attempted robbery of their truck on May 1, 2002. Paul Sampleton, a supervisor at Brinks, testified that on that particular morning the usual driver for the route did not come to work and Sampleton had to fill in as driver that day. He arrived at the First Union Bank on Flat Shoals Parkway in Decatur, Georgia at approximately 9 a.m. to

---

[1] Willard Mahan, Andy Marbury, and Michael Davis testified in the present case pursuant to a plea agreement, and Dwight Elder and Darrell Cooper remain at large.

deliver cash to the bank. Although the regular driver usually parked in a particular area, he noticed that there was an abundance of cars in that area and decided to back the truck up to the bank on the opposite side of the building. He testified that after he parked he observed a suspicious gray Suburban circling the parking lot several times. Minutes later he heard a shotgun blast and saw that his partner, Milton Prince, had been shot.

Prince testified that he was taking coins off the truck to deliver to the bank when he heard footsteps behind him. When he turned around a man with a ski mask fired a shotgun at him. Although Prince had been hit, he managed to climb inside the Brinks truck and yelled for Sampleton to leave. A second masked man attempted to enter the truck and fired his weapon several times. As the truck pulled out of the parking lot the second individual fell off the truck and Sampleton was able to flee the scene. Although no money was taken, Prince was shot in the chest, arm and foot. He showed the jury where the shot was embedded in his arm and testified that he continues to experience pain in his foot. Because both robbers were masked, neither Sampleton nor Prince was able to identify either shooter.

Three cooperating co-defendants, Willard Mahan, Andy Marbury, and Michael Davis, testified at trial. Mahan testified that as a former employee of Brinks, he was responsible for devising the plan to rob the truck. He testified that

4

co-conspirator Dwight Elder advised him as to when the truck would be making the deliveries and how much money would be on the truck because he had a contact who was still employed with Brinks. Mahan testified that he and others had attempted to rob the Brinks truck on numerous prior occasions. All attempts failed and he testified that he recruited Blasingame and Bradley because he felt they were people on whom he could depend. Marbury testified that he had been in involved in the conspiracy since the beginning and his account of the events leading up to the attempted robbery were consistent with Mahan's testimony.

Davis, who had not met either Blasingame or Bradley until the night before the attempted robbery, named Defendants as the gunmen on the day of his arrest before entering into any agreement with the Government. Davis's account of the conspiracy and attempted robbery were also consistent with Mahan's testimony. In addition, Davis testified that he was threatened by Blasingame while they were in custody together at the Union City Jail. Davis testified that Blasingame "expressed to me that he read my testimony and he knew what I said and if I testified, I'd better stay in jail or he would kill me."

Mahan, Marbury, and Davis all admitted that they were cooperating with the Government in order to receive shorter sentences and that they all had used either marijuana or cocaine. In addition, the following inconsistencies were shown in

5

their testimony: (1) Marbury stated that he did not provide Davis with cocaine or rum on the day of the robbery, but Davis stated that he did; (2) Mahan told the Grand Jury that the handgun used in the robbery was not his, but later admitted that he gave his handgun to Bradley to use during the robbery; (3) A government agent's report indicated that Marbury initially stated he used Elder's Mercedes, yet Marbury testified at trial that the Mercedes he used belonged to his mother and the agent was mistaken; (4) Davis called Marbury "Andy Rapper" on one occasion; (5) Davis initially said he was picked up from his house, but then testified that he was picked up at the bus stop "right up the street" from his house; (6) Mahan testified that Marbury was driving his mother's Mercedes, but he previously indicated Marbury was driving his mother's Monte Carlo.

Clifford Wilson, a close friend of both defendants, testified that Defendant Bradley admitted to him on the day of the robbery that he and Defendant Blasingame participated in the attempted robbery of the Brinks armored truck. Wilson testified further that he was told by Defendant Mahan and Defendant Bradley that they planned to rob a Brinks truck. He also testified that the conspirators had gathered at Mahan's home the night before the robbery attempt to discuss the final details of the robbery, and that Blasingame was present that night. Wilson also testified about statements allegedly made to him by Bradley in which

6

Bradley stated that he and Blasingame participated in the robbery.

Blasingame chose to testify in his own defense and testified that he did not know Michael Davis, and that co-defendants Mahan and Marbury were "not in his social circle." However, Blasingame could not account for his whereabouts on the morning of the robbery. He claimed at first to have been at work, but when pressed could not say for whom, where, or for what period of time he worked that day. Blasingame then claimed that he could have been working in his yard that morning. He also claimed that because he had asthma he could not have been one of the shooters who ran up to the truck during the robbery.

Blasingame called Alexis Bradley who confirmed that Blasingame had asthma and stated that he could not run. In addition, Toyin Kadiya testified that she witnessed the attempted robbery and that the shooter she saw through the tinted window of the vehicle was darker than Blasingame. She first testified that she ducked into the seat as soon as she saw the man with the gun exit his vehicle, but then stated that she saw the man with the gun shoot before ducking into her seat. Further, the jury was shown a picture of a window of a vehicle that had heavily tinted windows and Kadiya agreed that was what the window of the robber's car had looked like when she saw through it.

In his defense Bradley presented the testimony of Ronald Christian and

Christian's nephew, Jeffrey Bernard Christian. Both testified that on May 1, 2002 at 9:15 in the morning while they were cutting the grass in Bradley's yard they spoke to Bradley about a party he had thrown. Ronald's log book, which referenced cutting Bradley's grass on that day, was admitted to corroborate his testimony. He also testified that he knew what time it was when he saw Bradley that day because his routine was to take his child to school, return to his home to get his lawn equipment, pick up his nephew, and proceed to the lawn he was cutting on that day.

Bradley also presented the testimony of his fiancee, Larhonda Ward, who testified that Bradley drove her to work on the day in question, and therefore could not have been at the scene of the attempted robbery across town. She testified that she knew it was May 1, 2002, because she was pregnant and suffering from morning sickness, but had to go to work anyway because it was the first of the month.

On cross-examination all three witnesses had no recollection of dates and times of significant events that had occurred in their own lives, but maintained that they recalled the specific date and time of their conversations with Bradley. Further, Ward admitted that her son was born exactly nine months after the attempted robbery, suggesting that it was unlikely that she was suffering from morning sickness on the morning in question.

8

Upon deliberation the jury convicted Bradley and Blasingame of both counts in the indictment. Blasingame timely moved for a new trial on four grounds: (1) the court erred in allowing Wilson to testify about Bradley's confession; (2) the court erred in admitting a photograph showing his tattoo; (3) the court sentenced him pursuant to the unconstitutional sentencing guidelines; and (4) the court's comments informed the jury that he was incarcerated. Bradley also timely filed a Motion for a New Trial arguing that the court should not have used the federal sentencing guidelines, and that he was prejudiced when the jury was informed that he was incarcerated. The district court denied both motions.

In determining Blasingame's sentencing guidelines range with respect to Count One, the probation officer assigned Blasingame a base offense level of 20, pursuant to U.S. Sentencing Guidelines Manual § 2B3.1. This base offense level was increased by two since "the property of a financial institution … was taken, or … the taking of such property was an object of the offense." Id. § 2B3.1(b)(1). Because Blasingame discharged a firearm seriously wounding the Brinks employee, his base level was further increased by four for causing serious bodily injury. Id. § 2B3.1(b)(3)(B). Blasingame also received a four-level enhancement for being an organizer or leader of criminal activity that involved five or more persons, Id. § 3B1.1(a) and a two-level enhancement for obstructing justice. Id. §

9

3C1.1. With these enhancements, Blasingame's total offense level was 32, and when coupled with his Criminal History Category of II, his guidelines range on Count One was 135 to 168 months. As to Count Two, there were no guidelines calculations because that offense called for a consecutive statutory mandatory minimum term of ten years. Id. § 2K2.4, 18 U.S.C. § 924(c) (2000).

Blasingame objected to the leadership role enhancement, as well as the obstruction of justice enhancement, on sufficiency of evidence grounds. At sentencing, the district court overruled Blasingame's objection to the obstruction of justice enhancement, but sustained his objection to the leadership enhancement because there was insufficient evidence that he played a leadership role. Without that enhancement Blasingame's new total offense level was 28, and his guidelines range for Count One was 87 to 108 months. The court sentenced Blasingame to 108 months in prison as to Count One and to a consecutive 120 months prison term on Count Two for a total sentence of 228 months. In imposing the sentence the court remarked that it pronounced a sentence at the top of the guidelines range "because of the aggravating factors in this case; based on the evidence in the case, there was an actual attempt to kill one of the drivers of the vehicle." Blasingame did not raise a constitutional challenge to his sentence based on his Sixth Amendment right to a trial by jury.

In determining Bradley's sentencing guidelines range with respect to Count One, the probation officer assigned him a base offense level of 20, pursuant to U.S. Sentencing Guidelines Manual § 2B3.1. This base offense level was increased by two since "the property of a financial institution . .. was taken, or ... the taking of such property was an object of the offense." Id. § 2B3.1 (b)(l). Because Bradley discharged a firearm seriously wounding the Brinks employee, his base offense level was further increased by four for causing serious bodily injury. Id. § 2B3.1 (b)(3)(B). Bradley also received a four-level enhancement for being an organizer or leader of criminal activity that involved five or more persons, Id. § 3Bl.l(a), and a two-level enhancement for obstructing justice. Id. § 3C1.1. As a result of these enhancements, Bradley's total offense level was 32, and, when coupled with his Criminal History Category of I, his guidelines range on Count One was 121 to 151 months. As to Count Two, there were no guidelines calculations because that offense called for a consecutive statutory mandatory minimum term of ten years, pursuant to U.S.S.G. § 2K2.4 and § 924(c). Id. § 2K2.4, 18 U.S.C. § 924(c) (2000).

Bradley objected to receiving the enhancements for being a leader and for obstructing justice on sufficiency of the evidence grounds. At sentencing, the district court sustained both of Bradley's objections, which yielded a new total offense level of 26 and a guidelines range of 63 to 78 months. Bradley then

requested a downward departure due to poor pre-trial prison conditions. The district court denied his request, stating "I don't think a downward departure is appropriate but I will consider that type of punishment when I impose a sentence on Count 1." The district court also asked defense counsel to address its "concern" that Bradley's co-defendant, Patrick Blasingame, seemed to be more of the leader, and Bradley seemed to be more of the follower. The district court commented that while Bradley's role would not be "grounds for a downward departure," it would be a consideration in determining where to sentence Bradley within the guidelines range. After hearing argument on this point, the district court said "I'm not going to the bottom of the guideline range but I'm going to the upper level of 74 months." When the Government attempted to defend the pre-trial prison conditions Bradley was subjected to, the district court explained that its reason for the "reduction is more on the grounds that my impression is that Mr. Bradley was more of a follower in this situation." The court then sentenced Bradley to 74 months on Count One, 120 months on Count Two, to be served consecutively, for a total of 194 months. Bradley did not raise a constitutional challenge to his sentence based on his Sixth Amendment right to a trial by jury.

## II. DEFENDANT BLASINGAME

### A. Bradley's Confession to Clifford Wilson

First, Blasingame argues that his Sixth Amendment right to confrontation was violated, according to the rule announced in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), when Bradley's confession to Clifford Wilson, which also implicated Blasingame, was entered into evidence. Although Blasingame admits he did not object to the testimony in the district court, he nevertheless argues that he did not waive the Bruton issue because the Government failed to comply with its duty under Rule 14 to notify the district court of a potential Bruton issue.  He argues that Rule 14 of the Federal Rules of Criminal Procedure imposed an implicit duty upon the Government to make the district court aware of any potential Bruton issue. Pursuant to that alleged duty, Blasingame argues that the Government's failure to put the parties or the district court on notice that a Bruton issue existed in the case excuses his failure to object in the district court.

Rule 14 of the Federal Rules of Criminal Procedure provides that "[b]efore ruling on a defendant's motion to sever, the court may order an attorney for the Government to deliver to the court for *in camera* inspection any defendant's statement that the Government intends to use as evidence." The text of the rule clearly imposes a duty upon the Government to notify the court  of a potential Bruton issue only after being ordered to do so by the court. Nothing in the record

13

indicates that the district court ever contemplated or entered such an order. Accordingly, since the text of Rule 14 does not impose a duty upon the Government to introduce <u>Bruton</u> issues absent a court order, any failure on the Government's part to comply with this nonexistent duty cannot excuse Blasingame's failure to object to the testimony. Because Blasingame failed to object to Wilson's testimony at trial, he must show that the district court committed plain error by allowing a non-testifying co-defendant's confession into evidence. Fed. R. Crim. P. 52(b).

To establish plain error a defendant must show (1) that the district court erred, (2) that the error was plain, and (3) that the error was prejudicial. <u>United States v. Foree</u>, 43 F.3d 1572, 1578 (11th Cir. 1995) (citing <u>United States v. Olano</u>, 507 U.S. 725, 732-36, 113 S.Ct. 1770, 1776-79, 123 L.Ed.2d 508 (1993)). With respect to the third element, it "is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." <u>Olano</u>, 570 U.S. at 734, 113 S.Ct. 1778, 123 L.Ed.2d 508. Further, even if a defendant established all three elements, an error should only be corrected if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." <u>Foree</u>, 43 F.3d at 1579 (citing <u>Olano</u>, 570 U.S. at 736-38, 113 S.Ct. 1779-80, 123 L.Ed.2d 508).

In <u>Bruton</u>, the United States Supreme Court held that the admission of a

non-testifying co-defendant's confession, which directly implicated the defendant, violated the defendant's Sixth Amendment right to confrontation, even if the jury was given instructions to consider the confession only against the co-defendant. 391 U.S. at 126, 88 S.Ct. at 1622, 20 L.Ed.2d 476. The Court explained that the credibility of these types of confessions was not only inherently suspect, but was especially unreliable when the confession could not be tested on cross-examination. Id. at 136, 88 S.Ct. at 1628, 20 L.Ed.2d 476. Here, Clifford Wilson was allowed to testify that Bradley confessed that he and Blasingame participated in the attempted robbery. As Bradley did not take the stand, Blasingame was not allowed the opportunity to cross-examine him about these allegations. Yet, even if we assume that allowing Wilson's testimony was error and that the error was sufficiently plain to satisfy the second prong of the plain error test, Blasingame cannot meet the hefty burden of showing that the error affected the outcome of the trial.

In an attempt to satisfy the prejudice element of the plain error test, Blasingame asserts that Wilson's testimony was the only incriminating evidence presented by a witness not cooperating with the Government. He claims that the three cooperating witnesses who implicated him were "successfully impeached" and that an eyewitness to the incident could not identify him as one of the robbers.

He also points to United States v. Veltmen , 6 F.3d 1483 (11th Cir. 1993), and United States v. Morales, 477 F.2d 1309 (5th Cir 1973),[2] as similar cases in which a Bruton error amounted to reversible error.  Finally, he argues that the prejudice requirement is satisfied because Wilson's testimony was by far the most damaging evidence presented. Contrary to Blasingame's assertion, the prejudice requirement of the plain error test is not established merely because the error allowed damaging evidence to be admitted. Blasingame must show that the error affected the outcome of the district court proceeding. United States v. Rodriguez, 398 F.3d 1291, 1299, cert. denied, __ U.S. __, 125 S.Ct. 2935, 162 L.Ed.2d 866 (11th Cir. 2005) (citing United States v. Cotton, 535 U.S. 625, 632 (2002)) (internal citations omitted).

Initially, the cases cited by Blasingame do not advance his argument as they are inapplicable to the facts of this case. In Veltman, this court reviewed a Bruton violation under the harmless error standard, not the plain error standard that is applicable here. 6 F.3d at 1501. Although both standards are similar, the harmless error standard places the burden on the Government to prove the error did not affect the outcome of the proceedings, while the plain error standard places the burden on the defendant to establish that the error did affect the outcome of the

_____

[2]  Decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981).

16

proceeding. Likewise, although the Morales court did review a Bruton error under the plain error standard, the case was decided before the Supreme Court established, in Olano, the specific elements and burdens of the plain error standard. The Morales court rather concluded that the improperly admitted confession amounted to plain error because the confession was one the major pieces of evidence that linked the defendant to the crime. 477 F.2d at 1316. Under Olano, a defendant must establish not only that the improperly admitted confession contributed to the outcome of the proceeding, but that without the confession the outcome of the proceeding would have been different. 570 U.S. at 734,113 S.Ct. 1778, 123 L.Ed.2d 508. Moreover, as the prejudice element of the plain error test heavily depends on the facts of the particular case, there can be no hard and fast rule that will apply to every case.

Further, all three cooperating co-conspirators consistently told the same general story and all identified Blasingame as one of the shooters. Although defense counsel was able to point out some discrepancies in their testimonies, the cooperating co-conspirators were far from successfully impeached; any discrepancies in their testimonies were minor.[3] Also, the fact that the three co-

---

[3] Perhaps the most significant discrepancy was that Davis stated that Marbury had given him some cocaine and rum the day of the robbery and Marbury denied doing so. Mahan did admit that he lied to the Grand Jury about owning a gun; however, because both Marbury and Davis also

17

conspirators all cooperated with the Government does not, as Blasingame suggests, mean that their testimony should be summarily ignored in determining whether the district court's error prejudiced Blasingame. Although the fact that the co-conspirators were cooperating with the Government in exchange for shorter sentences may have made the jury more skeptical of their testimony, there is no evidence that suggests that the jury completely disregarded their testimony, especially considering the consistency of their statements. Further, although the eyewitness stated the man she saw was darker than Blasingame, she saw the man through the heavily tinted rear window of a vehicle and testified that she ducked immediately after seeing the gun. Given the overwhelming evidence provided by the cooperating co-defendants, who each identified Blasingame as one of the shooters, the jury likely placed little weight in her testimony.

Because the trial transcript establishes that there was substantial independent evidence of Blasingame's involvement, we find that Wilson's testimony regarding Bradley's confession was just another cumulative piece of evidence establishing Blasingame's guilt. Initially, all three cooperating co-conspirators testified that Blasingame was one of the shooters during the attempted robbery. In addition,

identify Blasingame as a shooter, it is unlikely that Mahan's lie had any effect on whether or not the jury believed that Blasingame was one of the shooters.

although Blasingame took the stand asserting his innocence, he could not affirmatively recall where he was or what he was doing the morning of the attempted robbery. Blasingame first asserted that he was working that morning, but after he could not recall where or for whom he worked, he admitted that he may have been at his home.

In addition, the properly admitted remainder of Wilson's testimony also established Blasingame's involvement. Wilson independently testified that Blasingame was present at Mahan's home the night before the robbery when the plans for the robbery were finalized. This testimony confirmed the testimony of all three cooperating co-defendants that Blasingame was involved in the planning of the robbery and had been present the night before when the details were finalized. As there was substantial and overwhelming evidence of Blasingame's involvement, independent of Wilson's testimony, Blasingame cannot meet the prejudice requirement of the plain error test.

### B. Picture of Blasingame's Tattoo and Wound

Blasingame next argues that the district court erred when it allowed the Government to introduce into evidence a photograph of his torso, which showed his tattoo and a gunshot wound. Mahan, one of the cooperating co-conspirators, testified at trial that in order to help identify the person he knew to be "Pat," he

19

described to authorities a scar that "Pat" had on his stomach. Agent Fonseca also testified that Mahan had described "Pat's" scar and tattoos and recounted Mahan's description of the scar for the jury. Over Blasingame's objection, the district court admitted a photograph of Blasingame taken at the time of his arrest that depicted a similar scar and numerous tattoos for the purpose of showing that "Pat" was Blasingame and to corroborate Mahan's identification of the defendant as one of the two masked gunmen who shot the victim. Blasingame argues initially that the photograph is not relevant and should not have been admitted into evidence. He asserts that the Government's proffered reasons for introducing the photograph are not valid. In the alternative, Blasingame argues that even if the photograph is relevant in some way, the prejudicial impact of the photograph far outweighed any probative value it had.

We review a district court's evidentiary ruling for a clear abuse of discretion and will only reverse an erroneous ruling if it affected the defendant's substantial rights. United States v.  Tinoco, 304 F.3d 1088, 1119 (2002). District courts have broad discretion in admitting relevant evidence. United States v. Terzado-Madruga, 897 F.2d 1099, 1117 (11th Cir. 1990) (citing United States v. Finestone, 816 F.2d 583,585 (11th Cir. 1987)). Thus, "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more

20

probable or less probable than it would be without the evidence" is generally admitted. See FED. R. EVID. 401. In contrast, a district court's discretion under Rule 403 to exclude relevant evidence because it would be unfairly prejudicial is limited. Finestone, 816 F.2d at 585. Rule 403 of the Federal Rules of Evidence is an extraordinary remedy that should be utilized sparingly. United States v. Elkins, 885 F.2d 775, 785 (11th Cir. 1989). Furthermore, because the balancing test under Rule 403 should favor admissibility, this court views the evidence "in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. at 785 (citing Finestone, 816 F.2d at 585).

Blasingame first argues that the photograph was not relevant and that the reasons proffered by the Government for its introduction are not valid. Blasingame argues that Mahan had known him for over ten years and therefore the photograph was not needed to prove his identity. Because Mahan's testimony clearly shows that he initially identified the shooter as "Pat," the Government used the photograph to show that "Pat" was actually Blasingame. Blasingame also contends that because Mahan did not describe the scar and tattoos to the jury, there was no evidence to show whether the photograph was consistent with Mahan's description of the scar and tattoos. Agent Fonseca, however, recounted Mahan's description of the scar for the jury. Thus, the photograph was admitted to allow the jury to see

whether the scar in the photograph matched "Pat's" scar that Mahan described to Agent Fonseca.

Blasingame also asserts that if the photograph was relevant he was unfairly prejudiced by it because a jury would be persuaded that a man with a gunshot wound and graphic tattoos would likely be involved in a conspiracy to commit an armed robbery. Blasingame argues that any probative value the photograph may have had was outweighed by its obvious prejudicial effect. Blasingame relies on United States v. Thomas, 321 F.3d 627 (7th Cir. 2003), for the proposition that the photograph's probative value was eclipsed by its prejudicial impact.

Here, the probative value of the photograph of Blasingame's scar and tattoos was not substantially outweighed by the danger of unfair prejudice. Although Mahan had known Blasingame for over ten years, it is clear from his testimony at trial that he described Blasingame as "Pat" when he initially spoke to authorities. Further, Blasingame tried to distance himself from Mahan and the other co-conspirators by claiming that Mahan and he were not in the same social circle or friends. Blasingame further testified that Mahan was a liar who had falsely incriminated him. Therefore, the photograph was used by the Government to show that Blasingame was the person identified by Mahan as "Pat" and to further corroborate Mahan's identification of Blasingame as one of the two masked

22

gunmen who shot the victim.

Blasingame's reliance on <u>Thomas</u> is mistaken. In <u>Thomas</u>, the district court allowed the prosecution to admit a photograph of defendant's gun tattoo for the purpose of showing that the defendant approved of guns in order to refute the defendant's contention that he did not possess the firearm in question. <u>Id.</u> The United States Court of Appeals for the Seventh Circuit held that the tattoo of two crossed revolvers had no probative value because the tattoo only showed that because the defendant had a pair of guns tattooed on his forearm, he was the kind of person who was likely to possess guns. <u>Id.</u> The facts of the present case are strikingly different. Here, unlike the photograph in <u>Thomas</u>, Blasingame's photograph had significant probative value. As already discussed, the photograph was used to identify "Pat" and corroborate Mahan's identification of Blasingame. Any unfair prejudice Blasingame may have experienced from the photograph does not overcome the photograph's probative value. Moreover, given the presumption of admissibility under Rule 403, we cannot conclude that the district court abused its discretion in allowing the photograph to be admitted.

III. DEFENDANT BRADLEY

*A. Comments about Defendant's Incarceration*

Bradley first argues that he was denied a fair trial when the jury was

informed several times that he was in custody during trial. Bradley claims that he

was denied a fair trial, because: (1) the district court judge made remarks which

informed the jury that he was incarcerated;[4] (2) Michael Davis testified that

Blasingame threatened him in jail;[5] and (3) Herbert Durham testified that he had

[4] The following exchange occurred in open court in the presence of the prospective jury panel:
>
> Court: Have a seat. I want to ask the marshals, why did it take so long to bring the defendants up?
> Marshal: There was a mix-up, Your Honor, probably on my part. I left earlier to get something and finish it, and I didn't realize I was suppose to come back.
> Court: Do you want to apologize to the jury?
> Marshal: I apologize, Your Honor.
>
> The following exchange occurred in open court in the presence of the jury:
>
> AUSA Sam-Buchanan: The government calls Michael Davis to the stand.
> Court: If any member of the jury needs a break at any time in the next five, ten, fifteen, twenty minutes, let me know and we will take a short break, but it looks like we're going to go until about 5:15 today.
> AUSA Sam-Buchanan: Your Honor, apparently, the witness is still on the way up.
> Court: All right. The witness is on the way up?
> AUSA Sam-Buchanan: Yes. He is not up here yet.
> Court: All right. All right. Is he in custody?
> AUSA Sam-Buchanan: Yes, he is in custody.
> Court: Well, lets wait a couple of minutes to see if he shows up.
>
> The following is an excerpt of the district court's cautionary instructions to the jury:
>
> Before I give you the charge I do want to make one point to you, and that is you might have noticed in the trial a number of Marshals at various times in the courtroom; at one time, I think we had as many as six. They wore plain clothes, maybe you didn't recognize them, but they were over here and there in the back and inside the bar, but that has absolutely no bearing on the guilt or innocence of the defendants and you shouldn't consider that in any way. As a matter of fact, they were here primarily because we has a number of witnesses who were in custody . . . .

[5] The following is an excerpt from Davis's direct examination:
>
> AUSA Sam-Buchanan: Would you tell the ladies and gentlemen of the jury about that conversation?
> Davis: We had a brief meeting in the hallway and he expressed to me that he read my testimony and he knew what I said and if I testified, I'd better stay in jail or he would kill me.

visited Bradley in jail.[6] Bradley also contends that the combination of these incidents amounted to a constant reminder that he was incarcerated, which deprived him of the presumption of innocence.

A presumption of innocence in favor of the accused is a basic element of a fair trial in our system of justice. Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691,1692, 48 L.Ed.2d 126 (1976). That presumption of innocence is impaired and an accused's right to a fair trial is violated when the accused is required to attend trial in prison clothing. Id. at 504, 96 S.Ct. at1693, 48 L.Ed.2d 126. See also United States v. Harris, 703 F.2d 508, 509-11 (11th Cir. 1983)(right to a fair trial impaired

---

AUSA Sam-Buchanan: What did you say?
Davis: I didn't exchange words with him at all.
The following is an excerpt from Davis's cross-examination:
    Pate: Finally, Mr. Davis, you testified that at some point, Mr. Blasingame told you you'd better stay in jail and not testify; is that an accurate statement?
    Davis: Pretty much accurate.
    Pate: Okay. And you say this occurred in the hallway; were you all at the jail at the time?
    Davis: (No response.)
    Pate: It's okay in response to my question if you answer that truthfully.
    Davis: Yes.

[6] The following is an excerpt from Durham's cross-examination:
    AUSA Sam-Buchanan: Now, you have talked to Mr. Bradley recently, have you not?
    Durham: Yes.
    AUSA Sam-Buchanan: And he would sometimes call you collect?
    Durham: Right.
    AUSA Sam-Buchanan: And have you visited him at the jail?
    Durham: Yes.
    AUSA Sam-Buchanan: Now –
    Durham: I've visited both of them.

when defendant was compelled to attend voir dire in prison clothing). Further, we have previously noted that whether the jury directly learns of a defendant's incarceration from  testimony or infers the fact from a defendant's clothing is of no consequence. United States v. Villabona-Garnica, 63 F.3d 1051, 1058 (11th Cir. 1995). Yet, "the mere utterance" of the words jail or prison does not automatically entitle a defendant to a new trial. United States v. Veteto, 701 F.2d 136, 139-40 (11th Cir. 1983)(quoting United States v. Barcenas, 498 F.2d 1110, 1113 (5th Cir. 1974)). Rather, it is the "constant reminder of the accused's condition" that is "so likely to be a continuing influence throughout the trial" that presents an "unacceptable risk" to the presumption of innocence. Estelle, 425 at 504-05, 96 S.Ct. at 1693, 48 L.Ed.2d 126.

Even assuming that the comments and testimony complained of either directly informed the jury of defendant's incarceration or allowed the jury to infer the fact, the comments and testimony, individually do not raise to the level of a "constant reminder." The court's initial comments at most caused the jury to speculate about whether the defendant was incarcerated, and the court's cautionary instructions to the jury specifically attributed the increased presence of United States Marshals to the incarcerated witnesses. These comments were not only brief, but required the jury to make several inferential steps to conclude the defendant

26

was in custody.

Likewise, any comments that indicated Bradley was incarcerated from either Davis's testimony or Durham's testimony were also brief passing comments. None of these comments rise to the level of reversible error. See United States v. Beasley, 2 F.3d 1551, 1559 (11th Cir. 1993 ) (no reversible error because witness's response to a question on cross-examination that he met the defendant in prison was a passing remark followed by a curative instruction); United States v. Morcovic, 911 F.2d 613, 616 (11th Cir. 1990)("It is almost frivolous to argue that a mistrial should have been granted because three jurors saw the defendants in handcuffs when they were being removed--especially since the court gave cautionary instructions."). Furthermore, these four brief comments, which do not independently amount to reversible error, do not combine to create a "constant reminder" of the defendant's incarceration. Even considering the combined effect of these comments, they were nevertheless brief and occurred sporadically over the course of a multi-day trial. They simply do not amount to a "constant reminder" or rise to the level of reversible error.

*B. Denial of Bradley's Motion for Severance*

Bradley next argues that he suffered compelling prejudice when the district court abused its discretion in denying his motion for severance and required him to

be jointly tried with Blasingame. Bradley argues that he was prejudiced in two ways: (1) Davis was allowed to read the transcript of his plea colloquy which contained assertions that the defendants had threatened him while they were in custody; and (2) Blasingame pursued a trial strategy which confirmed to the jury that he was in pre-trial custody. Bradley further argues that because the evidence against him relied entirely upon word of mouth, with no physical evidence to corroborate the stories of the co-conspirators, the prejudice he suffered was compelling.

"The general rule in this circuit is that defendants who are jointly indicted should be tried together, and this rule has been held to be particularly applicable to conspiracy cases." United States v. Alvarez, 755 F.2d 830, 857 (11th Cir. 1985). A severance under Rule 14 of the Federal Rules of Criminal Procedure should be granted only if the defendant can demonstrate that a joint trial would result in specific and compelling prejudice to the conduct of his defense. United States v. Marzalkowski, 669 F.2d 655 (11th Cir. 1982). When a district court denies a defendant's motion to sever, we review that denial for abuse of discretion. United States v. Jacoby, 955 F.2d 1527, 1542 (11th Cir. 1992). We will only reverse a district court's denial of a severance motion if the denial "result[ed] in compelling prejudice against which the district court could offer no protection." United States

v. Walser, 3 F.3d 388, 385 (11th Cir. 1993). The test for compelling prejudice is "whether under all the circumstances of a particular case, as a practical matter, it is within the capacity of the jury to follow the [instructions] and accordingly . . . appraise the independent evidence against each defendant's own acts, statements and conduct." United States v. Kabbaby, 672 F.2d 857 (11th Cir. 1982). Further, even if a defendant can show some prejudice, a defendant is entitled to severance only if that "prejudice flowing from a joint trial is clearly beyond the curative powers of precautionary instruction." United States v. Morrow, 537 F.2d 120, 126 (5th Cir. 1977).

Here, Bradley argues compelling prejudice is established because testimony of a threat made by Blasingame, that improperly implied that Bradley also threatened the witness, was admitted and because Blasingame chose to freely admit to the jury that he was in custody during the trial. First, the district court specifically instructed the jury that the testimony regarding the threat should only be considered against Blasingame and not Bradley. Because the district court gave appropriate instructions to the jury and Bradley has offered no evidence suggesting that the jury was unable to follow the court's instructions, the threat testimony does not establish compelling prejudice. In addition, because compelling prejudice does not exist merely because there is evidence at trial that is applicable only to a co-

29

defendant, the fact that Blasingame chose to inform the jury that he was in custody does not establish compelling prejudice either.  See United States v. Alvarez, 755 F.2d 830, 857 (11th Cir. 1985) ("defendant does not suffer 'compelling prejudice' simply because much of the evidence at trial is applicable only to his codefendants.")

*C. Agent Fonseca's Statement that a Witness Refused to Testify out of Fear*

Bradley argues that the district court erroneously admitted hearsay evidence that a witness refused to testify at trial due to fear. Bradley argues the district court erred in allowing Agent Fonseca to testify that Jeff Ridley, who was involved in one of the earlier robbery attempts but later withdrew from the conspiracy, was scared to testify against the defendants. Bradley argues that allowing Agent Fonseca's testimony violated the confrontation clause because his statement was testimonial hearsay. He further argues that because the evidence in the case consisted solely of the testimony of co-conspirators, without independent corroboration, the admission of this statement by the non-testifying declarant cannot be considered harmless, and the conviction should be reversed.

Rule 801 of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Statement" is further defined

30

as "(1) an oral or written assertion, or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." FED. R. EVID. 801(a). Here, Agent Fonseca stated, "[Ridley] flat-out did not want to testify; he was scared to testify against the defendants." This statement is not hearsay. Agent Fonseca neither repeats Ridley's oral statements nor describes Ridley's nonverbal conduct. Agent Fonseca simply asserted that in his opinion Ridley refused to testify because he was scared to testify against the defendant. His statement may have been an irrelevant opinion;[7] however, it is not hearsay.

### D. Prosecutors' Cross-examination of Bradley's Alibi Witnesses

Bradley argues that counsel for the Government was allowed to ask Bradley's alibi witnesses questions regarding events which negatively impacted the witnesses' characters. He asserts that the prosecution's purpose for asking these damaging questions was not to test the memory of the witnesses regarding dates, but rather to improperly attack the witnesses' characters. Yet, the Government asserts that the questions were designed to demonstrate that the witnesses' testimonies were unworthy of belief because none could remember significant

---

[7] Although Bradley attempted to argue that Agent Fonseca's opinion was irrelevant opinion testimony at oral argument, by failing to raise the argument in his brief, he has waived the issue. McFarlin v. Conseco Services, LLC, 381 F.3d 1251, 1263 (11th Cir. 2004) ("A party is not allowed to raise at oral argument a new issue for review."); Flanigan's Enterprises, Inc. v. Fulton County, 242 F.3d 976, 987 n.16 (11th Cir. 2001)(issue not developed in a party's brief is waived).

events which had occurred in their own lives.

Bradley called three alibi witnesses. The mother of his child, Larhonda Ward, testified that on the morning of the attempted robbery she was suffering from such severe morning sickness that Bradley had to drive her to work and he therefore could not have been at Mahan's home gearing up for the robbery. However, on cross-examination, Ward admitted that her son was born exactly nine months after the attempted robbery, a fact which established that at the time she claimed to be having morning sickness she was only at the most a few days pregnant. Jeffrey Christian and Ronald Christian testified that they cut defendant Bradley's grass on the day of the robbery and that they recalled that at exactly 9:15 a.m. that day they were talking to him in the backyard. On cross-examination, Government counsel questioned both men regarding their recollection of events which had occurred in their personal lives. Ronald Christian was asked about the birth of his child, an award he received, and a reprimand he had received at work. Jefferey Christian was questioned about his recollection of a speeding ticket he received less than one week after the robbery and about his firing by his employer on suspicion of theft. In each instance the witness had no recollection of the dates and times of significant events in his own life, but they both maintained that they recalled the date and specific time at which they had a backyard conversation with

Bradley.

"[E]vidence relevant to a material issue is not rendered inadmissible because it happens to include references to specific bad acts of a witness. Extrinsic evidence of a witness' prior misconduct should be excluded where that evidence is probative only of the witness' general propensity for truthfulness." United States v. Calle, 822 F.2d 1016, 1021 (11th Cir. 1987). The prosecutor's questions were relevant to show that it was unlikely that the alibi witnesses could actually remember the exact time and date of everyday events that occurred over a year prior when the same witnesses could not remember the exact time and date of significant events that occurred in their respective lives around the same time. Accordingly, the questions were not offered solely as evidence of the witnesses' general propensity for truthfulness and were properly admitted.

### E. Prosecutor's Recitation of Witnesses' Prior Testimony

Bradley argues that the district court erred in allowing prosecutors to read several witnesses' prior testimony aloud. He argues that the proper method would have been to ask if a witness recalled the testimony, and if not, to refresh the witness's recollection by allowing them to silently review the testimony. While Bradley is correct in his explanation of the requirements of Rule 612 of the Federal Rules of Evidence, he neglects to consider Rule 801.

33

Rule 801 provides that a prior consistent statement of a declarant testifying at trial and subject to cross-examination is admissible when offered "to rebut an express or implied charge against him of recent fabrication, improper influence or motive." FED. R. EVID. 801 (d)(1)(B). Thus, to rebut an express or implied charge that the witness is motivated, has been influenced to testify falsely, or that the witness's testimony is a recent fabrication, evidence is admissible that the witness told the same story before the motive or influence came into existence or before the time of the alleged recent fabrication. Tome v. United States, 513 U.S. 150, 157, 115 S.Ct. 701, 130 L.Ed.2d 574 (1995). Moreover, "[w]here credibility has been challenged on the basis of facts absent from the prior statement, the [prior] statement [is] admitted when it [is] consistent with the remaining testimony." United States v. Hamilton, 689 F.2d 1262, 1273 (6th Cir. 1982) (citing United States v. Lombardi, 550 F.2d 827, 828 (2nd Cir. 1977)).

Here, defense counsel suggested to the jury that both Mahan and Davis recently fabricated their testimony because they failed to include specific facts in prior statements each had given to authorities. Accordingly, this assertion entitled the Government, under Federal Rule of Evidence 801(d)(1)(B), to respond by demonstrating, with evidence of the witness's prior consistent statements to the court, that the witness had indeed told authorities the specific facts referred to by

defense counsel.

## IV. SENTENCING

Both Blasingame and Bradley appeal their total 228-month and 194-month sentences, respectively. Both defendants argue that their sentences under Count One are unconstitutional as a result of Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and now United States v. Booker, 543 U.S. __, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), because their offense levels were increased due to findings of fact made by the district court and not the jury. They further challenge their sentences on Count Two by arguing that Blakely overruled United States v. Gray, 260 F.3d 1267 (11th Cir. 2001), and United States v. Pounds, 230 F.3d 1317 (11th Cir. 2001), two cases in which this Court held that whether a defendant brandished or discharged a firearm in violation of 18 U.S.C. §924(c)(1)(A) is a sentencing factor that need not be included in the indictment nor submitted to a jury. Pounds, 230 F.3d at 1319, Gray, 260F.3d at 1281.

Because Blasingame and Bradley both failed to properly raise their Blakely claims at sentencing in the district court,[8] we review their sentencings for plain

---

[8] Although both defendants filed Motions for a New Trial, which included a Blakely argument, neither defendant made an objection at sentencing. Because an objection for Booker purposes is only timely if made at or prior to sentencing, we are limited to the plain error standard. United States v. Candelario, 240 F.3d 1300, 1304 (11th Cir. 2001)(constitutional objection for Apprendi purposes is timely if made at sentencing).

error. Rodriguez, 398 F.3d at 1298. Under plain error review, the court will not reverse unless (1) there is error, (2) it is plain, (3) the error affected the defendant's substantial rights, and (4) if left uncorrected, would seriously affect the "fairness, integrity, or public reputation of judicial proceedings." Id.  To satisfy the third prong of the plain error test in the Blakely/Booker context, a defendant must show that "there is a reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge." Id. at 1301. Even if we assume Defendants can meet the first two elements of the plain error test, they cannot establish that their sentences would have been any different had the sentencing guidelines been advisory.

The district court sentenced Blasingame to the maximum possible sentence available under the guidelines and commented that it imposed this sentence because of the "aggravating factors in this case," including "an actual attempt to kill one of the drivers of the vehicle." With such commentary by the district court at sentencing, Blasingame cannot show that there is a reasonable probability of a different result had the guidelines been advisory. See United States v. Williams, 408 F.3d 745, 755-56 (11th Cir. 2005) (holding that the defendant failed to satisfy the third-prong of the plain error test because the district court's statements at sentencing indicated that it had sentenced the defendant at the top of the guidelines

36

range because the facts of that case warranted it, and not because the sentence was mandated by the guidelines).

The district court also sentenced Bradley near the top of the guidelines, after carefully considering several factors, including whether he was a leader or a mere participant. The district court had an opportunity to depart downward in sentencing, but declined to do so because it thought that would be inappropriate. It appears that the district court sentenced Bradley near the top of the guidelines because it believed such a sentence was warranted under the facts of this case, and not because the guidelines mandated it. The fact that Bradley did not receive the maximum possible sentence under the guidelines, standing alone, does not mean there is a reasonable probability that he could receive a lesser sentence. Indeed, this Court has recently recognized that even a sentence at the bottom of the guidelines was insufficient, in and of itself, to conclude that the treatment of the guidelines as mandatory affected the district court's sentence. United States v. Fields, 408 F.3d 1356, 1360-61 (11th Cir. 2005).

## V. CONCLUSION

For the foregoing reasons, the convictions and sentences of both Blasingame and Bradley are AFFIRMED.